**Application of Elmo T. CHRISTIANSON for Reinstatement to the Bar of the State of North Dakota.**

**Nos. 8520, 8761.**

Supreme Court of North Dakota.

Jan. 31, 1974.

Elmo T. Christianson, pro se.

Donald J. Olson, Grand Forks, for Grievance Commission of the Supreme Court.

VOGEL, Judge.

The petitioner was suspended from practice as an attorney at law in this State on September 18, 1956, upon conviction of a felony in Federal Court. See Christianson v. United States, 226 F.2d 646 (CA8 1955), cert. denied 350 U.S. 994, 76 S.Ct. 543, 100 L.Ed. 859 (1956). On May 16, 1957, his right to practice was reinstated.

On February 13, 1970, he was suspended for reasons which appear in In re Christianson, 175 N.W.2d 8 (N.D.1970). The decision provided that the petitioner would "have the privilege of applying for reinstatement of a certificate of admission to the bar one year after the entry of this order, on a showing that he has made restitution . . . and that he is otherwise qualified to be reinstated as a member of the bar of the state of North Dakota."

On March 2, 1971, he applied for reinstatement as an attorney at law. The matter was referred to the appropriate grievance committee of the State Bar Association which, upon investigation, found that certain complaints were made against the conduct of the petitioner. The Grievance Commission of this court held a hearing on the complaints, as well as upon the petition for reinstatement, and filed its report with this court. In April 1972, a hearing was held on the report and recommendations of the Grievance Commission, and on May 5, 1972, this court ordered "that the certificate of admission of Elmo T. Christianson to the bar of the State of North Dakota shall remain suspended, with a provision that the said Elmo T. Christianson may reapply for reinstatement after January 1, 1973, and may be reinstated upon a proper showing at that time." Application of Christianson, 202 N.W.2d 756 (N.D.1972).

By application dated January 8, 1973, the petitioner again applied for reinstatement. The matter was again referred to the grievance committee, again further complaints developed, again they were investigated, and again the Grievance Commission conducted an investigation and made its recommendation. The findings of fact and conclusions of law and recommendation of the Grievance Commission are as follows:

## FINDINGS OF FACT

"1. That the certificate of admission of Elmo T. Christianson to the Bar of the State of North Dakota was suspended in 1970 by action of the Supreme Court of North Dakota as reported in 175 N.W.2d 8.

"2. That suspension thereof was continued by action of the Supreme Court of North Dakota as reported in 202 N. W.2d 756.

"3. That under Rule XIII of the Supreme Court Rules of Disciplinary Procedure, the burden is upon an applicant seeking reinstatement to establish the averments of his application by clear and convincing evidence.

"4. That the petitioner in his petition stated, in part:

'1) that petitioner has observed the mandate of the Court in every respect and has not practiced law since its order of suspension. . . .'

"5. That the petitioner during the suspension of his certificate of admission to the Bar of North Dakota prepared a Will for one Rosa Johnson.

"6. That during the period of suspension, the petitioner incorporated The Par Bar and received check No. 3020 dated October 31 in the amount of $55.00 for his work in forming the said corporation.

"7. That during the period of suspension, the petitioner incorporated J & R Automotive Jobbers, Inc. and received therefor check No. 101 dated March 9, 1973 in the amount of $442.95 bearing the notation 'corporation tax and records', a part of which represented fees for his work in setting up the corporation.

"8. That the petitioner in his statement to Grievance Committee No. 1 on March 24, 1973 falsely denied having received any money in connection with the incorporation of J & R Automotive Jobbers, Inc. when in fact he had received the check referred to in paragraph 7 hereof on or about the date it bears, namely March 9, 1973.

"9. That the petitioner during the period of suspension actively undertook with Attorney Robert Fiedler [*sic*] of Grand Forks the representation of one Robert A. Blackburn in a criminal case; that the petitioner participated in every aspect of the case except actual court room appearances, and that his work included investigation and preparation of pre-trial motions, trial briefs and closing argument.

"10. That for his work, the petitioner received payment from Robert Blackburn in the total sum of $250.00 by checks as follows:

| | | |
|---|---|---|
| Check No. 459 dated April 3, 1972 | $ 50.00 |
| Check No. 289 dated March 10, 1972 | $100.00 |
| Check No. 297 dated March 18, 1972 | $ 50.00 |
| Check No. 409 dated April 28, 1972 | $ 50.00 |

"11. That the petitioner falsely stated to the Grievance Committee No. 1 on March 24, 1973, that he had not received any money from Blackburns and that he had been paid for his work by Attorney Fiedler [*sic*].

"The Grievance Commission further reaches the following:

## "CONCLUSIONS OF LAW

"1. That the petitioner, in violation of the mandate of the Supreme Court and the statutes of the State of North Dakota has engaged in the unauthorized practice of law during a period when his certificate of admission to the Bar was suspended.

"2. That the petitioner has wholly failed to sustain the burden of showing that he is entitled to reinstatement to the Bar of the State of North Dakota.

"3. That the petitioner has not established the averments of his application by clear and convincing evidence.

## "RECOMMENDATION

"The Grievance Commission unanimously recommends that the suspension of petitioner's certificate of admission to the Bar of the State of North Dakota be continued indefinitely, and that the petitioner be assessed actual costs as determined by the Clerk of the Supreme Court."

The petitioner admits that he prepared the will of Rosa Johnson, that he incorporated the Par Bar, that he incorporated J & R Automotive Jobbers, Inc., and that he assisted Attorney Robert Feidler in representing Robert A. Blackburn in a criminal case.

He attempts to excuse the drafting of the will by stating that Mrs. Johnson was hospitalized and afraid she would soon die; that she was talking in Icelandic and that a member of the hospital staff called the petitioner, who speaks Icelandic, and asked the petitioner to talk to her; and particularly that in drafting the will the petitioner was acting as the clerk of a practicing attorney, Wesley Argue, of Hamilton, North Dakota. He also denies receipt of a fee for incorporating the Par Bar.

Apparently neither Mrs. Johnson, who is still living, nor Mr. Argue was interviewed by representatives of the grievance committee or the Grievance Commission. Mr. Argue's affidavit is submitted on behalf of the petitioner, but it makes no reference whatever to the matter of the drafting of Mrs. Johnson's will. It states only that Mr. Argue "knows of no instance where Mr. Elmo T. Christianson has engaged in the practice of law since the time of the suspension of his license" and "that the affiant has no knowledge of any unauthorized practice of law by Mr. Elmo T. Christianson during the period of time when his license to practice law was suspended." It is totally silent as to whether Mr. Christianson ever acted as clerk for Mr. Argue.

We discussed the difficulty of defining the term "practice of law" at some length in Cain v. Merchants National Bank & Trust Company of Fargo, 66 N.D. 746, 268 N.W. 719 (1936), particularly as applied to the practice of law by a corporation employing a licensed lawyer in its trust department. We said: "The exact scope of practicing law even under the best definitions laid down by the courts is not always readily discernible." We concluded that:

" . . . a person who is not a member of the bar may draw instruments such as simple deeds, mortgages, promissory notes, and bills of sale when these instruments are incident to transactions in which such person is interested, provided no charge is made therefor. These simple instruments are usually prepared upon or with the aid of printed forms and seldom involve a high degree of legal skill. The drawing of complicated legal instruments such as wills or trust agreements require more legal knowledge than is possessed by the average layman. They must be framed from a mass of facts so as to convey the intention of the parties and bring about a desired legal result. One who draws such instruments for others practices law even though such instruments might, to some extent, be incident to a business such as that usually conducted by trust companies.

"In this case the facts disclose that in some instances the defendant has invaded the field of legal practice. The wills which we have previously mentioned constitute isolated instances of practicing law. . . . "

We find no difference between drawing wills for others and incorporating a corporation for others.

To obtain articles of incorporation for another is to practice law. Florida Bar v. Town, 174 So.2d 395 (Fla.1965).

■ The petitioner has the burden of establishing the averments of his application for readmission by clear and convincing evidence. The proof must be of a satisfactory character and of sufficient weight to overcome the former adverse judgment as to the petitioner's character. Application of Christianson, 202 N.W.2d 756 (N.D.1972).

■ We sustain the findings of the Grievance Commission that the petitioner engaged in the practice of law while suspended, by drawing and supervising the execution of a will and by incorporating two corporations.

Continuing to engage in the practice of law has been held to be sufficient ground for denying reinstatement. In re Lacey, 11 Cal.2d 699, 81 P.2d 935 (1938); In re Mill-

er, 34 A.D.2d 159, 310 N.Y.S.2d 195 (1970); Application of Grimes, 494 P.2d 635 (Okl.1971); State v. Butterfield, 172 Neb. 645, 111 N.W.2d 543 (1961); Houts v. State ex rel. Oklahoma Bar Assn, 486 P.2d 722 (Okl.1971).

The petitioner contends that his assistance of Attorney Robert Feidler in defending Robert Blackburn consisted solely of acts which any layman could lawfully perform as a law clerk and that he could act as a clerk to a practicing lawyer, although suspended himself. Robert Feidler, the attorney of record for Mr. Blackburn, is admitted to practice in this State and he supports the assertion of the petitioner that the petitioner acted as his law clerk in the defense of Mr. Blackburn.

In view of this contention, and in view of the contention of the petitioner that he is permitted to engage in any activities which laymen may lawfully perform, even though such activities are also normally considered part of the practice of law when engaged in by a licensed attorney, we are confronted with two difficult problems: (1) to what extent, if any, may a suspended attorney engage in activities which, when performed by a licensed attorney, constitute a part of his practice of law, but which also may be performed lawfully by laymen; and (2) to what extent, if any, may a suspended attorney assist a licensed attorney in activities which would constitute the practice of law? On the one hand, it seems extremely harsh to rule that a suspended lawyer, who has already been subjected to the deprivation of his means of livelihood, should further be deprived of opportunities to earn a living by doing things which laymen are permitted to do, such as investigating accidents, preparing tax returns, filling out simple deed forms as a real estate broker, and doing legal research as a law clerk to a licensed attorney. On the other hand, the petitioner appears to take the extreme position that he is permitted to do anything that a layman could do, and, as a law clerk, every-

thing that an attorney could do except appear in the courtroom. To adopt this view would mean that the suspension of one's license to practice law would be a penalty lightly borne. A line must be drawn somewhere between these two extremes.

## PERFORMING ACTS WHICH MAY BE PERFORMED BY LAYMEN

The precise question of the extent to which a disbarred or suspended lawyer may perform acts which when performed by licensed attorneys constitute a part of their practice of law, but which acts are also sometimes lawfully performed by laymen, has been directly decided twice by closely divided courts. In State v. Butterfield, *supra,* by a 4-to-3 majority, and in Houts v. State ex rel. Oklahoma Bar Ass'n, *supra,* by a 5-to-4 majority, it was held that suspended or disbarred attorneys may not perform acts which are usually performed by attorneys in the active practice of law and which, when performed by licensed attorneys, would constitute a part of their practice of law, even though laymen may on occasion perform the same acts without engaging in the unauthorized practice of law. Such acts include, for example, selecting printed legal forms and filling them out, and preparing tax returns.

Justice Brower, concurring in part and dissenting in part in *Butterfield,* alluded to the fact that Butterfield alleged that he had performed certain acts in his capacity as a licensed real estate broker, real estate agent, abstracter, and notary public, and then went on to say:

"In some instances one's law practice is his principal occupation and the other occupations are but incidents to it. In others the occupation of a broker, land agent, and income tax accountant constitute the major portion of one's business. I cannot believe that one must desist from vital matters in such other occupa-

tions in which he is engaged to permit hope of reinstatement, . . ." 111 N.W.2d at 551.

We are inclined to agree with that statement.

Chief Justice Simmons, concurring in the dissent of Justice Yeager in *Butterfield*, pointed out:

"It now appears that when the respondent was suspended we left him with a sword of Damocles hanging over his head in that we deprived him of all the rights of a lawyer while suspended but now hold him subject to all the standards of a lawyer during that period.

"A suspended lawyer has to live and do and earn. Respondent is now being disbarred for doing those things which it is common knowledge are done by laymen without citations for contempt for practicing law. . . ." 111 N.W.2d at 553.

We could also say of Mr. Christianson that he was left "with a sword of Damocles hanging over his head." He, however, had no other money-making or professional business closely related to the field of law except that of making tax returns, which is not the basis of any claim in this proceeding. We concede that our prior orders gave him little guidance as to the nature of activities prohibited to him. Neither in his case nor in any other of this State has a determination been made that suspended attorneys are more limited in what they may do than laymen are. What we have to say on this subject hereinafter is therefore intended as guidance for the future, and not as applicable to past activities of the petitioner here.

The problem created by marginal activities by a suspended lawyer can be illustrated with Mr. Christianson's own words:

" . . . I also, of course, tried to divorce myself completely from the law, and have done that more or less successfully. It is a very difficult thing from the standpoint that people come to you —whether you are licensed or not, with one attitude, and then secondly apparently for free advice, or try to verify advice they get from others, and if they're strangers it's not too difficult to run 'em off, but if they're friends and neighbors they are a problem, and I solve that by simply calling the lawyer involved after they have left. I prepared one Will for Rosa Johnson, she was in the hospital in Cavalier with a heart attack, and she is Icelandic and I speak, read and write Icelandic—nevertheless, before I did that I called Wesley Argue and they are poor people and the upshot of the whole thing was I got the information from her in the hospital, drew the Will and took it back that same night and she executed it and we didn't charge her anything for it and left it at that, otherwise I would have handled it as a clerk for Wesley.

" . . . I investigated [the Blackburn case] and prepared a lot of the pleadings for Robert Feidler, but I did not appear in the courtroom at all; I advised Judge O'Keefe that I had done some of this work and that's about it from that standpoint. And of course I do a lot of tax work."

If a suspended lawyer so conducts himself, it is difficult to see how the general public can know whether or not he is entitled to practice law.

■ A suspended lawyer is not the same as a layman. The public knows that he has a legal education, that he has engaged in the practice of law, and that his work and his opinions are presumably more valuable on that account. We cannot accept the argument that a disbarred or suspended lawyer may engage in all activities which nonlawyers also perform. On the other hand, we are not willing to foreclose him from acts which he is permitted to perform by reason of alternate qualifications, such as a real estate broker's license. In the case of In re Peterson, 175 N.W.2d 132 (N.D.1970), the petitioner made his living during suspension as an abstracter without

being criticized for so doing. A suspended lawyer may engage in some such activities if he is otherwise qualified to do so, but not if his qualifications come from having been a lawyer. For example, a suspended lawyer who is also a public accountant may prepare tax returns as a public accountant. But a suspended lawyer may not prepare the papers necessary to incorporate a corporation merely because one of the stockholders of the corporation might also be able to fill in blanks on a printed form by himself. When professional expertise enters into the activity, and when the activity is one which is customarily performed by lawyers, then such activity is forbidden to a suspended attorney, even though under some conditions members of other professions may sometimes be allowed to perform the same acts.

■ As to the claim that he should be allowed to perform acts such as laymen may on occasion perform, such as drawing simple deeds, we hold that he is subject to the same restrictions as are laymen, such as the limitation that they involve his own business and that he charge no fee. See Cain v. Merchants National Bank & Trust Company of Fargo, *supra*.

## ACTING AS A LAW CLERK

■ The basic distinction between the activities of a law clerk and those of a lawyer is that a law clerk works for an employing attorney, while an attorney engages in professional activities for a client.

Perhaps the most definitive statement in case law of just what a law clerk may do is embodied in the following from Ferris v. Snively, 172 Wash. 167, 19 P.2d 942 (1933):

"We realize that law clerks have their place in a law office, and we recognize the fact that the nature of their work approaches in a degree that of their employers. The line of demarcation as to where their work begins and where it ends cannot always be drawn with abso-

lute distinction or accuracy. Probably as nearly as it can be fixed, and it is sufficient to say that it is work of a preparatory nature, such as research, investigation of details, the assemblage of data and other necessary information, and such other work *as will assist the employing attorney* in carrying the matter to a completed product, either by his personal examination and approval thereof or by additional effort on his part. The work must be such, however, as loses its separate identity and becomes either the product, or else merged in the product, of the attorney himself." [Emphasis added.] 19 P.2d at 945.

A further statement on the same subject is as follows:

"A lawyer can employ lay secretaries, lay investigators, lay detectives, lay researchers, accountants, lay scriveners, nonlawyer draftsmen, or nonlawyer researchers. In fact, he may employ nonlawyers to do any task for him except counsel clients about law matters, engage directly in the practice of law, appear in court or appear in formal proceedings a part of the judicial process, so long as it is he who takes the work and vouches for it to the client and becomes responsible to the client." ABA Comm. on Professional Ethics, Opinions, No. 316 (Supp.1967), quoted from 71 Colum.L. Rev. 1153, 1172.

In In re McKelvey, 82 Cal.App. 426, 255 P. 834 (1927), a disbarred attorney, upon application for reinstatement, was held not to have engaged in the practice of law during the 10-year period following his disbarment although the evidence showed that he had been employed as a law clerk for brief intervals during that period and that he had, as a law clerk, done research and prepared briefs and pleadings and had given advice on minor legal matters to clients of his attorney-employer.

The court held that the petitioner had not attempted by these actions to practice law indirectly and thus evade the effect of

his disbarment in light of the fact that the evidence failed to show that he was:

1. Obtaining clients;

2. Retaining his former clients;

3. Serving clients with the connivance of another attorney and through the use of another attorney's name; or

4. Receiving a law clerk's salary as a surrogate for legal fees.

A disbarred attorney who is ostensibly employed as a clerk in the office of a licensed attorney engages in the practice of law when he retains his own clients, acts independently of the licensed attorney in matters regarding legal advice, and handles legal matters in toto, in that the alleged attorney-employer has knowledge of the existence of such matters but does not supervise or manage their progress and disposition. Upon these facts, the attorney-employer is subject to discipline. Crawford v. State Bar of California, 54 Cal.2d 659, 7 Cal.Rptr. 746, 355 P.2d 490 (1960).

In the instant case, however, it is not necessary for us to decide whether the petitioner was in fact a law clerk when he assisted Robert Feidler in the defense of Robert Blackburn, since we have already concluded that he engaged in the practice of law while suspended.

## CONCLUSION

In conclusion, we affirm the findings of fact of the Grievance Commission except for Nos. 9, 10, and 11 and that portion of No. 6 specifying the payment of $55, and affirm its conclusions of law.

While we commend the appellant for overcoming the liquor problem which contributed to his former difficulties, we must observe that he is apparently unable to resist the temptation to nibble at the boundaries of impermissible conduct by a suspended attorney. The rewards he has received for his infringements of the rules against his practicing law are pitifully small and it is deplorable that he should be deprived of readmission to the Bar because of them.

Yet we cannot continually overlook his transgressions, nor can we continually police his activities. While the history of his case might suggest the advisability of petitioner's abandoning his efforts to be readmitted, nevertheless it is our order that his suspension be continued and that he may, on or after July 1, 1974, reapply for reinstatement, and, if a proper showing is made, that he be readmitted at such time as may then be fixed.

ERICKSTAD, C. J., and TEIGEN, PAULSON and KNUDSON, JJ., concur.